X
____FILED ____ENTERED
____LOGGED ____RECEIVED
**3:38 pm, Jul 02 2020**
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _crp_____Deputy

1:20-mj-1699 to -1701 TMD

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A COMPLAINT, ARREST WARRANTS, AND SEARCH WARRANTS

I, Special Agent Emily Zagone of the United States Secret Service, being first duly sworn, state the following:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.  I submit this affidavit in support of the following:

    a.  a criminal complaint and arrest warrants for Dogar SINGH and Rehan AFRIDI, charging them with Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349.

    b.  a search warrant for BBQ Tonite/Al Madina Kabob, a kabob restaurant, located at 1808 Woodlawn Drive, Suite B and C, Gwynn Oak, MD, further described in Attachment A, for evidence described in Attachment B.

Probable cause for all of the forgoing applications can be found in sections 23 to 40   (Section IV, Merchant Information and Identification, and V, Refund Fraud Activity) of this affidavit.

2.  Based on the evidence gathered to date, there is probable cause to believe that Dogar SINGH ("SINGH") and Rehan AFRIDI ("AFRIDI") have Conspired to commit Bank Fraud, in violation of 18 U.S.C. § 1349.

3.  Further, there is probable cause to believe that the fruits, instrumentalities, and evidence of violations of Bank Fraud, in violation of 18 U.S.C. § 1344; Wire Fraud, in violation of 18 U.S.C. § 1343; Conspiracy to Commit Bank and Wire Fraud, in violation of 18 U.S.C. § 1349; and Access Device Fraud, in violation of 18 U.S.C. § 1029 (hereinafter the "TARGET OFFENSES") are presently to be found at BBQ Tonite/Al Madina Kabob, the businesses

operating at 1808 Woodlawn Drive, Suites B, and C, (hereinafter,  the "TARGET

BUSINESS"), further described in Attachment A.

4.   Because this Affidavit is being submitted for the limited purpose of establishing probable

cause for an arrest warrant and search warrant for businesses, I have not included every detail

of every aspect of the investigation.  Rather, I have set forth only those facts that I believe are

necessary to establish probable cause of the violation set forth above.  However, I have not

excluded any information known to me that would weigh against a determination of probable

cause.  The information contained in this Affidavit is based upon my personal knowledge,

my review of documents and other evidence, and my conversations with other law

enforcement officers and other individuals.

Agent Background

5.   I am a duly appointed Special Agent with the United States Secret Service ("USSS") and

have been employed as such since June 2017. Through my employment with the USSS, I

have gained knowledge in the use of various investigative techniques including the utilization

of physical surveillance, undercover agents, confidential informants and cooperating

witnesses, consensually monitored recordings, investigative interviews, financial

investigations, the service of administrative and grand jury subpoenas, mobile wireless

tracking methods, analyzing telephone pen register and caller identification system data, and

the execution of search and arrest warrants, including those executed upon physical addresses

as well as those executed upon electronic equipment and data storage providers.

6.   Throughout my career in law enforcement, I have become familiar with the methods and

techniques associated with financial institution fraud and counterfeit trends and tactics.  In

the course of conducting financial investigations, I have incorporated the use of the following

investigative techniques: interviewing informants, cooperating witnesses, victims and

subjects; physical surveillance and utilization of various surveillance techniques; supporting

undercover operations; participating in mobile wireless tracking missions; and preparing and

executing search and arrest warrants that have led to seizures of counterfeit currency, access

devices, and other instruments used to commit financial fraud.

7.  Based on my knowledge, training, and experience in the investigation of financial institution

fraud, I am familiar with the ways in which fraudsters conduct their business.  My familiarity

includes: the various means and methods by which individuals defraud financial institutions;

their use of cellular telephones and social media accounts to facilitate fraud; and their use of

code words to describe fraud.  I am familiar with the ways that those who commit financial

institution fraud are able to carry out their fraud without detection.  Financial institution fraud

is an ongoing and recurring criminal activity.  As contrasted with crimes against persons,

which tend to be discrete offenses, crimes such as bank fraud and wire fraud are illicit

commercial activities that are characterized by regular, repeated criminal activity.

8.   Based on my training, knowledge, and experience, I know that individuals engaged in

conspiracy and bank fraud retain evidence and fruits of their crimes in their homes,

businesses/places of work, vehicles, and on their electronic devices. Such evidence includes

financial documents (such as receipts, bank statements, checks, etc.) and communications

with co-conspirators, which are usually found on mobile or electronic devices.

9.  The TARGET BUSINESS, more particularly described in Attachment A, will uncover

evidence, fruits, and instrumentalities, more particularly described in Attachment B, related

to the scheme. Specifically, I believe a search of the TARGET BUSINESS will aid

investigators in identification of additional victims and co-conspirators, and the location of

victim funds and additional co-conspirator bank accounts.

10. Based on the investigation described below, I believe that the TARGET BUSINESS has been

used for one or more of the following:

    a.  Storage of financial records and financial instruments related to fraudulent activity and

        the profits derived from those transactions including, but not limited to, currency,

        checks, receipts, money orders, stocks, bonds, precious metals, real estate records, etc.

    b.  Maintenance of books, records and other documents that contain the names and contact

        information of associates in their fraudulent activities, including address books,

        telephones, cellphones, iPads, Tablets, or personal digital assistants with stored

        telephone information, notes reflecting telephone numbers, photographs, etc.

    c.  Storage of identification and travel documents, including tickets, transportation

        schedules, passports, notes, receipts related to travel, hotel receipts, etc.

    d.  Maintenance of documents identifying the occupancy, residency and/or ownership of

        the premises to be searched.

    e.  yield evidence, fruits, and instrumentalities concerning conspiracy to commit bank

        fraud.

11. Thus, this affidavit is also being submitted in support of an application for a search warrant

for the TARGET BUSINESS. Based on the information set forth in this affidavit, I submit

that there is probable cause to believe that the execution of search and seizure warrants for

the TARGET BUSINESS will yield evidence, fruits, and instrumentalities concerning bank

fraud and wire fraud.

4

## II.   <u>BACKGROUND OF CASE</u>

12. In October 2019, First Data (now Fiserv) identified merchants Al Madina Kabob and BBQ Tonite as part of a ring of 76 merchant accounts (hereafter known as the Suspect Merchants) engaged in refund fraud/invalid authorization fraud throughout Maryland, Michigan, New York, New Jersey, and Virginia.  To maintain the covert nature of the investigation, the Suspect Merchants will be referred to herein by number, e.g., Suspect Merchant #1, Suspect Merchant #2, etc… The aforementioned invalid authorizations (i.e. refunds and chargebacks) from BBQ Tonite and Al Madina Kabob were made to debit cards linked to bank accounts held by other merchants who are under investigation by the USPIS and FBI for engaging in the same pattern of refund fraud leading to loss by Fiserv and a network of banks, including TD Bank.

13. Fiserv utilized card crossover analysis to link all the suspect merchant accounts by payment cards used to make fraudulent refund transactions.  This analysis demonstrated that many of the businesses under investigation refunded the same debit cards.

14. For instance, merchant BBQ Tonite and Suspect Merchant #1 both refunded the same Mastercard debit card ending in 3351.  BBQ Tonite was linked to Suspect Merchant #2 because both refunded two of the same Visa debit cards ending in 8830 and 4539.

15. Card crossover analysis linked five payment cards used by Al Madina Kabob, BBQ Tonite, and Suspect Merchant #3.  The analysis then identified an additional fifteen payment cards used by both BBQ Tonite and Suspect Merchant #3 in fraud events. Capital One Bank accounts opened in the name of Suspect Merchant #3 carried out $27,947.72 in actual loss to the bank due to 13 fraudulent refund transactions from December 07, 2019 to December 09, 2019.

16. $48,850 of the refunds processed by BBQ Tonite were issued to PNC debit cards for accounts titled to Suspect Merchant #4. According to Fiserv, between November 12, 2019 and

November 14, 2019, the debit cards for these accounts were refunded 85 times by Suspect Merchant #2, totaling approximately $405,000 in transactions.

17. BBQ Tonite refunded cards linked to bank accounts held by Suspect Merchant #5, which then carried out refund credits to Suspect Merchant #2. Investigators identified the Fifth Third Bank account titled to Suspect Merchant #2 as receiving approximately $1.3 million in merchant deposits from November 12, 2019 and November 21, 2019.

18. Overall, according to Fiserv, the aforementioned Suspect Merchants to date have processed 2,426 credit and debit card transactions totaling $10,782,047. Of these, card cross-over analysis has linked 160 cards to the fraud scheme.

19. This loss was spread out amongst banks, with TD Bank, Capital One, and BB&T being the hardest hit. Notably, merchant Al Madina Kabob caused TD Bank $232,152.40 in loss. Fiserv also suffered loss, as it is able to be held responsible for the funds from invalid transactions. Fiserv recovered approximately $1.1 million from the 76 merchants conducting this fraud but ultimately suffered $432,386.96 in actual loss. Of this loss, $238,337.59 resulted from refund fraud carried out by merchants BBQ Tonite and Al Madina Kabob.

20. The investigation into these 76 Merchants and bank accounts is being carried out by agents of the U.S. Secret Service (USSS), the US Postal Investigators Service (USPIS), and Federal Bureau of Investigation (FBI), and targets include Al Madina Kabob, BBQ Tonite, and 74 other merchants identified as the Suspect Merchants.

21. Based on my training and experience, I know that these Fiserv records reflecting the sharing of debit cards linked to bank accounts for each merchant amongst the different merchants indicates a larger criminal conspiracy. This is because at various times, each of the merchants themselves played all possible roles in the scheme, whether it was as a recipient of a refund,

issuer of refund, or recipient or issuer of a check or wire transfer from an account whose balance has been inflated due to a fraudulent refund. Further, I know that criminals carry out financial fraud with co-conspirators in order to move money in and out of accounts with the hope of reciprocity and because it would be impossible for them to take advantage of loopholes in credit card processing parties by themselves.

## III.   EXECUTION OF THE CRIMINAL ACTIVITY

22. This criminal activity was carried out in two ways by the Suspect Merchants.

23. The first way was using a point of sale (POS) devices operating on Fiserv networks to charge credit cards for hundreds of thousands of dollars in a short amount of time that were force posted using fictitious authorization codes. Fiserv provided law enforcement with records of phone calls indicating that individuals identifying themselves as being associated with the Suspect Merchants contacted Fiserv and received permission to manually batch[1] the transactions, in contrast to bulk batching transactions with merchant processor companies once a day, as the majority of merchants do. This resulted in the funds being force posted[2] and immediately deposited into the associated bank accounts, and the money from these transactions was immediately withdrawn from the deposit account.

24. The second way the fraud was carried out was by taking advantage of recent financial industry changes that have made refund transactions issued to credit/debit cards from POS terminals immediately available to spend before being completed by the issuing merchant.  In this case, the Suspect Merchant's POS terminals were used in a coordinated effort to facilitate refund

---

[1] "Batching out" is when an authorization (sale/refund, etc.) is fully processed and sent to the processor to finalize. Most merchants batch out all transactions from their POS terminals in bulk at the end of the business day, a process known as "bulk batching". This is an automatic process carried out by the POS terminal.

[2] Force posting a transaction indicates when a transaction is essentially "pushed through" a POS terminal and sent on to the recipient card and associated account- thus bypassing the authorization process. This is usually carried out by using a previously obtained authorization code from a previous valid transaction.

credit fraud. Temporary refund credits were processed from one shell company merchant account to numerous debit cards. These debit cards were also associated with various shell company accounts. This process temporarily increased the amount of available money on the associated debit cards. The refunds were only temporary authorizations and lacked the appropriate funding to complete the transactions. This ultimately resulted in a reversal. However, the temporary funds that were available during the refund process had already been debited from the account. Prior to the reversal, the account owners were able to withdraw funds through wire transfers, cashier checks, money orders, gift card transactions, and ATM transactions.

25. Fiserv indicated that the debit cards used with the refund transactions were not associated with any previous transaction. The refunds were issued without an initial transaction to offset it. The authorization codes entered to force the refunds were fictitious or obtained from a previous transaction and reused and were ultimately never verified by the banks. Ultimately, this movement of refunds (in the form of credits) that were later returned as fraudulent led Fiserv to suffer loss, as well as the banks involved.

## VI.   MERCHANT INFORMATION AND IDENTIFICATION

26. Based on my training and experience, I know that fraudsters often operate multiple businesses out of the same address or operate as fronts or covers to garner or solicit fraudulent activity.

### A. Al Madina Kabob Restaurant/ /Madinaa Foods, LLC

27. Fiserv records show that Al Madina Kabob Restaurant is the Doing Business As (DBA) Madinaa Foods, LLC, and is assigned Merchant Identification (MID) #496287835888 at address 1808 Woodlawn Drive, Suites B and C, Gwynn Oak, MD. According to Fiserv records, it is registered to Mohan Manda of 16 Loretta Lane, Hicksville, NY. It is also assigned MID

#517939370111536 with the aforementioned identifiers. Open source research and surveillance confirms that 1808 Woodlawn Drive, Suites B and C, Gwynn Oak, MD, is currently occupied by a kabob restaurant identified as BBQ Tonite.

28. Per the Maryland State Department of Assessments and Taxation (SDAT), Madinaa Foods, LLC was incorporated on 01/23/2019 at 1808 Woodlawn Drive, Gwynn Oak, MD, to Mohan Manda and was assigned ID #W19373836. Al Madina Kabob, also known as Madinafoods LLC, located at 1808 Woodlawn Drive, Gwynn Oak, MD. Open source research demonstrates that the business is a kabob restaurant.

   **B.  BBQ Tonite/Madinafoods, LLC**

29. Fiserv records show that BBQ Tonite, DBA Madinafoods, LLC, is assigned MID #825368190880 at address 1808 Woodlawn Drive, Gwynn Oak, MD, registered to Mahinderpal Dhaliwal at address 2521 Molton Way, Baltimore, MD. Open source research and surveillance confirms that BBQ Tonite is the name advertised at the physical location on suites B and C at 1808 Woodlawn Drive, Gwynn Oak, MD, and it is a kabob restaurant.

30. Per SDAT, Madinafoods, LLC was incorporated on 01/17/2019 at 1808 Woodlawn Drive, Gwynn Oak, MD to Mahinderpal Dhaliwal and was assigned ID #W19363399. Notably, no suite numbers were provided, both businesses are still active according to SDAT, and both businesses are listed with the stated purpose of "fast food".

31. Based on records from Fiserv, three merchant accounts (496287835888, 825368190880, and 517939370111536) were established at the physical location of 1808 Woodlawn Drive, Suites B and C, Gwynn Oak, MD, under two DBA names (BBQ Tonite and Al Madina Kabob) between January and March 2019. Based on my training and experience, I know that

fraudsters often establish multiple business accounts and identities, even those with state agencies and government registries, for the purpose of carrying out fraud.

32. USSS Agents completed surveillance of 1808 Woodlawn Drive, Suites B, and C, Gwynn Oak, MD on several occasions in August 2019 and March 2020. Agents confirmed the business operating in these suites is named BBQ Tonite, which is identified as a kabob restaurant, The agents observed minimal patronage of the establishments on each surveillance, with no more than ten patrons of the establishment and three to five employees observed at any time of day or during the week. The nature of this business as a small restaurant and registered LLCs is inconsistent with the movement of multiple Visa refunds amounting to thousands of dollars at a time over a period of several days, further indicating the fraudulent nature of this activity.

## V.    REFUND FRAUD ACTIVITY

33. Recorded phone calls to Fiserv's customer service phone number on the dates below from Manda and Dhaliwal indicate their usage of point of sale (POS) terminals operating on Fiserv payment processing systems. Dhaliwal utilized a Clover POS terminal, while Manda utilized a Verifone VX 570 POS terminal. Each of the phone calls described in Paragraph 35 began with an individual identifying themselves verbally as either Manda or Dhaliwal by stating their full name and MID, per Fiserv requirements.

34. Fiserv advised law enforcement that the Suspect Merchants across the board manually "batched out" immediately after each stint of fraudulent activity, preventing transactions from being edited from their device.

35. Phone records show that on January 26, 2019, Dhaliwal contacted Fiserv customer support and requested the ability to manually batch out transactions using his Clover terminal. Records of

the call indicate that he was walked through the process and gained the ability to manually batch out transactions. Manda followed a similar process in a call placed on April 05, 2019.

36. According to Fiserv, Dhaliwal and Manda's interest in being authorized to manually batch out transactions was to enable POS terminals to quickly initiate the authorization process and to allow funds to be deposited into the bank accounts associated with the cards charged. The goal of the manual batch out transaction process was to speed up the authorization process before the processor or banks could determine they were illegitimate. Based on my training and experience, I believe that Dhaliwal and Manda were attempting to ensure they could initiate and complete fraudulent transactions in the same day due to previous attempts to issue fraudulent refunds to credit/debit cards that were cancelled by Fiserv.

37. Records from Fiserv show that during the period of May 2019 to September 2019, both merchants Al Madina Kabob and BBQ Tonite engaged in invalid authorizations[3] to credit/debit cards, all of which were later returned for fraud. Fiserv suffered the bulk of the loss as the banks did not accept the loss and conferred the loss on the third-party processor (Fiserv) that allowed the refunds to be issued. The actual loss outlined here is independent of the aforementioned loss suffered by the banks.[4] (Charts detailing this fraud are attached as an appendix).

38. During the period of May 12, 2019 to May 16, 2019, using MID #517939370111536, Al Madina Kabob issued 22 chargeback[5] transactions for a total of $57,529.20, all of which were

---

[3] An invalid authorization occurs when the merchant's bank account cannot support the amount of the transaction, leading this transaction to be rejected later by the merchant's bank and subsequently recognized as invalid by Fiserv.
[4] This includes loss experienced by TD Bank due to invalid refund authorizations from merchant Al Madina Kabob to TD Bank accounts operated by Dogar Singh, Rehan Afridi, and their associated businesses. This will be described later in the affidavit.
[5] A chargeback is a transaction/authorization on a card made by a merchant that the cardholder or card brand later disputes as being invalid or fraudulent, leading Fiserv or the third-party processor to refund that cardholder and then contact the merchant to obtain the funds. The merchant, in this case Al Madina Kabob, almost always lacked the funds in their bank account, leading Fiserv to ultimately take on the amount as loss.

returned as fraudulent. According to Fiserv, the refunds were processed with the Al Madina Kabob's MID credentials (issued to Mohan Manda) using his Verifone VX 570 POS terminal. MID #517939370111536 was terminated for fraud on June 18, 2019. Fiserv incurred $29,827.91 in actual loss over 18 transactions for this MID[6].

39. During the period of September 15, 2019 to September 23, 2019, using MID #825368190880, BBQ Tonite issued 59 refund transactions for a total of $522,580.00. According to Fiserv, the refunds were processed with BBQ Tonite's Clover credentials (issued to Mahinderpal Dhaliwal). In each case, the Clover terminal for this merchant was used to issue "open" or "naked" refunds[7] to a batch of credit cards in card-present transactions[8] using invalid authorizations. Notably, in each case, the merchant's credentials were used to batch out or attempt to batch out immediately after issuing the refunds. MID #825368190880 was terminated for fraud on September 23, 2019. Fiserv incurred $208,509.68 in actual loss over 29 transactions for this MID.

## VI.   BACKGROUND- TD BANK FRAUD

40. This affidavit is also a criminal complaint and arrest warrant for Dogar SINGH and Rehan AFRIDI for their involvement in receiving these fraudulent refund credits and transferring and withdrawing the funds, causing additional loss to TD Bank, in violation of Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349.

---

[6] The reason for this lower amount is that Fiserv was only responsible for approximately $40,000 in loss from these chargebacks and was able to hold onto about $11,000 of that amount.

[7] "Open" or "naked" refunds are those that do not require an initial use of the card to make an offsetting transaction at the terminal, as most refund transactions do.

[8] Card present transactions are those that involve the physical swiping or inserting of a chip, as opposed to manually inputting card data on a keyboard or computer.

41. In late April 2019, TD Bank investigators advised USSS Agents that the bank had suffered a loss as a result of refund fraud activity. This loss was independent of the loss on part of Fiserv but also involved recently established businesses across Maryland, Michigan, New Jersey, New York, and Virginia.

42. TD Bank investigators further indicated that between April 15, 2019 and April 23, 2019, two individuals identified as Dogar SINGH and Rehan AFRIDI caused a combined $232,152.40 in actual loss to TD Bank. SINGH's and AFRIDI's ability to carry out these fraudulent transactions was based on the issuance of multiple Visa refunds in amounts of $2,000.00 - $35,000.00, totaling $776,900.00. These refunds were from merchant Al Madina Kabob and were sent to SINGH and AFRIDI's TD Bank business and personal accounts. According to TD Bank transaction, a POS terminal identified as belonging to merchant Al Madina Kabob was used to issue the credits. As stated above, surveillance of this establishment in August 2019 and March 2020 resulted in agents observing minimal patronage of the business, making the movement of multiple Visa refunds amounting to thousands of dollars at a time over a period of several days between several recently formed businesses suspicious and indicative of potential fraud.

43. In each case, TD Bank rejected the refunds from Al Madina Kabob as fraudulent. But in the time between Al Madina Kabob's issuance of the refund and TD Bank's rejection of the refund, the accounts that received the refunds briefly had an inflated account balance while the refund remained in a "pending" status. During this time, the individuals receiving the illegitimate refunds withdrew most of the funds at casinos and ATMs, wrote checks, and transferred funds between their accounts.  TD Bank investigators advised that the fraud is

demonstrable because the refunds never appeared on bank statements, but rather only in

"pending" status on transaction history reports, before ultimately being rejected as fraud.

## VII.    BACKGROUND- SINGH AND AFRIDI

44. Dogar SINGH (DOB: January 23, 1953) resides at 31 Beverly St., Floor One, Carteret, NJ,

and his listed occupation is "owner of a logistics service". He has no known criminal history

according to NCIC. SINGH has been a legal permanent U.S. resident since July 13, 2012,

and is a native of India.

45. Rehan AFRIDI (DOB: April 12, 1984) resides at 423 Green Lane, West Deptford, NJ, and

his listed occupation is "owner of a trucking service". He has no known criminal history

according to NCIC. He has been a naturalized U.S. citizen since November 27, 2002 and was

born in Pakistan.

### A. Account Opening/Activity

46. On April 1, 2019, at the TD Bank branch in Woodbridge, NJ, Dogar SINGH opened TD

Bank accounts ending in 2090, 52107, 2115 and 2123. SINGH opened personal checking

account 2123 using his New Jersey issued driver's license #S44901710001531. SINGH

opened accounts 2090, 2107, and 2115 under business name Dogar Logistics Inc., listing a

business address of 31 Beverly St., Carteret, NJ with accompanying business formation and

resolution documents. SINGH signed the new business account paperwork. The New Jersey

Department of the Treasury Division of Revenue and Enterprise Services Certificate of Inc.,

("PROFIT") for Dogar Logistics Inc. was provided to open the accounts. The paperwork was

dated February 7, 2019. The business purpose was described as "Trucking and logistics

related business" and 31 Beverley St., Carteret, NJ, was provided as the Registered Office for

the business, main business address, and home address for SINGH. The IRS Employee

Identification Number ("EIN") filing form was also included, showing that Dogar Logisitcs

Inc. was assigned EIN 83-3519854 on 02/11/2019. Video of this account opening was

captured, and in the picture below, SINGH can be seen opening the account (left, holding a

cell phone) with an individual identified as Sukhwinde Singh (who agents of the USSS and

USPIS believe is his son) (right). In the picture below that, SINGH can be seen making an

initial deposit with Sukwinde Singh and a bank employee and is pictured on the left.





47. On April 18, 2019, at the TD Bank West Deptford, NJ, branch, AFRIDI opened TD Bank

accounts ending 2397, 62107, and 2404 in the name of RSA Trucking NJ LLC, listing a

business address of 423 Green Lane, West Deptford, NJ.  On April 19, 2019, at the same TD

Bank branch, Rehan AFRIDI opened accounts 1943, 2420, 2438, in the name of RF Fashion

Collection Corp, listing a business address of 423 Green Lane, West Deptford, NJ. Rehan

AFRIDI signed the new business account paperwork for each account. The PROFIT

paperwork for RF Fashion Collection Corp and RSA Trucking NJ LLC was provided at this

time, and both documents were dated April 18, 2019. On this paperwork for RF Fashion

Collection Corp, the business purpose was listed as "online sale fashion garments and gift

items," while the paperwork for RSA Trucking NJ LLC listed the business purpose as "cargo

deliveries and ground shipments movers." AFRIDI provided 423 Green Lane, West

Deptford, NJ as the Registered Office for the business, main business address, and home

address on the paperwork for both businesses. The IRS EIN forms were also included,

showing that RSA Trucking NJ LLC was assigned EIN 83-4454859 on April 18, 2019 while

RF Fashion Collection Corp was assigned EIN 83-4471741 on April 19, 2019. TD Bank

video footage shows AFRIDI opening the accounts on April 18, 2019 (right, wearing a blue

shirt).



## B. Pending Visa Refunds from Al Madina Kabob

48. SINGH's four new TD Bank accounts carried minimal balances consisting of their initial

   deposits upon account opening (ranging from $25 to $100 each). Less than three weeks after

   initially opening these four TD Bank accounts, SINGH's accounts received a series of

   fraudulent and unauthorized Visa refunds from POS terminal #460316 identified as

   belonging to  Al Madina Kabob. The refunds appeared only on Transaction History

   statements for his accounts. They are as follows:

| Date | Refund Amount |
| --- | --- |
| | **Account Number 2090 (Dogar Logistics)** |
| 4/19/2019 | $17,000.00 |
| 4/19/2019 | $18,900.00 |

| | |
|---|---|
| 4/20/2019 | $5,000.00 |
| | **Account Number 2115 (Dogar Logistics)** |
| 4/19/2019 | $13,000.00 |
| 4/19/2019 | $9,000.00 |
| 4/22/2019 | $27,000.00 |
| 4/23/2019 | $26,500.00 |
| | **Account Number 52107 (Dogar Logistics)** |
| 4/19/2019 | $13,000.00 |
| 4/22/2019 | $27,000.00 |
| | **Account Number 2123 (Dogar Singh)** |
| 4/19/2019 | $14,000.00 |
| 4/23/2019 | $25,000.00 |
| | **TOTAL: $195,400.00** |

49. AFRIDI's six new TD Bank accounts carried minimal balances from their initial deposits upon account opening (ranging from $25 to $100 each). One day after AFRIDI opened these six TD Bank accounts, the accounts began receiving a series of fraudulent and unauthorized Visa refunds from Al Madina Kabob. The refunds appeared only on Transaction History statements for his accounts. They are as follows:

| Date | Refund Amount |
|---|---|
| | **Account Number 1943 (RF Fashion Collection Corp.)** |
| 4/19/2019 | $14,000.00 |
| 4/20/2019 | $8,000.00 |
| 4/23/2019 | $33,000.00 |
| 4/23/2019 | $12,000.00 |
| | **Account Number 62107 (RSA Trucking NJ LLC)** |
| 4/19/2019 | $25,000.00 |
| 4/19/2019 | $28,500.00 |
| 4/22/2019 | $25,000.00 |
| 4/23/2019 | $13,000.00 |
| 4/23/2019 | $35,000.00 |
| | **Account Number 2397 (RSA Trucking NJ LLC)** |
| 4/22/2019 | $28,000.00 |
| 4/22/2019 | $27,500.00 |

| | |
|---|---|
| 4/23/2019 | $29,000.00 |
| 4/23/2019 | $9,000.00 |
| 4/23/2019 | $23,000.00 |
| | **Account Number 2404 (RSA Trucking NJ LLC)** |
| 4/19/2019 | $13,000.00 |
| 4/22/2019 | $25,000.00 |
| 4/23/2019 | $13,000.00 |
| 4/23/2019 | $25,000.00 |
| | **Account Number 2420 (RF Fashion Collection Corp.)** |
| 4/19/2019 | $13,000.00 |
| 4/20/2019 | $9,000.00 |
| 4/22/2019 | $27,000.00 |
| 4/23/2019 | $33,000.00 |
| 4/23/2019 | $9,500.00 |
| 4/23/2019 | $23,000.00 |
| | **Account Number 2438 (RF Fashion Collection Corp.)** |
| 4/19/2019 | $13,000.00 |
| 4/20/2019 | $8,000.00 |
| 4/22/2019 | $27,000.00 |
| 4/23/2019 | $33,000.00 |
| | **TOTAL: $581,500.00** |

50. In total, the refunds from Al Madina Kabob to SINGH and AFRIDI's accounts amounted to $776,900.00. All of the foregoing transfers from Al Madina Kabob were returned as fraudulent by TD Bank to both SINGH and AFRIDI's accounts.  As a result, those transfers only appeared on transaction history statements and not on the bank statements themselves. TD Bank investigators advised that the fact that these transfers did not appear on any bank statements for these accounts demonstrates their fraudulent nature.

**C. Movement of Funds via Withdrawals, Checks Written, and Transfers between Accounts**

51. Within days of receiving the foregoing funds via transfers from Al Madina Kabob, SINGH and AFRIDI's accounts were used to make online transfers into and out of the accounts, send

checks, and make withdrawals or cash advances from these accounts. All of this activity took place from April 19, 2019 to April 23, 2019.

52. AFRIDI's accounts were used to send 13 checks, ranging in amounts of $5,500 to $15,000, which totaled $151,700. Notably, five of the checks were addressed to Kuldeep and Mandeep Taxi Corp (TD Bank statements did not identify the other eight).  SINGH's accounts were used to send 18 checks, ranging from $2,000 to $17,000, totaling $151,900. All of these checks were dated April 19, 2019 and were returned for insufficient funds. Eleven of the checks were addressed to Dogar Logistics Inc., while five were addressed to Kuldeep and Mandeep Taxi Corp. In total, checks sent from the accounts amounted to $303,600.

53. SINGH and AFRIDI's accounts were used to make 14 transfers between their own accounts and each other's accounts on April 19, 2019 and April 22, 2019.  SINGH's TD Bank accounts were used to transfer $103,000 between his various accounts, and AFRIDI's account ending in 2397 made a $7,000 transfer to SINGH's account ending in 52107. SINGH's account 52107 was used to transfer $36,000 in total to several of AFRIDI's accounts.  In total, this transfer activity amounted to $146,000 between the accounts.

54. From April 20, 2019 to April 24, 2019, SINGH's accounts were used to make three large debit purchases ranging from $4,129 to $4,500 credited to Logex Technologies Worldwide Inc. Massapequa, NY and NRT Technologies, Las Vegas, NV, totaling $12,959.98.

55. AFRIDI's accounts were also used make a series of cash advances/withdrawals totaling $75,824.61 at various casinos and ATMs in Maryland, New Jersey, Delaware, and Pennsylvania from April 20, 2019 to April 22, 2019. The withdrawals ranged from $700 to $4,922. AFRIDI is pictured below (in a black t-shirt on the right) making two of the withdrawals at a TD Bank ATM in Atlantic City, NJ, both of which were for $700.00 on

April 21, 2019. (AFRIDI was also captured on ATM footage making three $700.00 withdrawals at a TD Bank ATM in Bensalem, PA on April 20, 2019, and two $700.00 withdrawals at a TD Bank ATM in Atlantic City, NJ, on April 22, 2019. This footage is not pictured below).



### D. Casino Activity

56. From April 19, 2019 to April 23, 2019, SINGH and AFRIDI's accounts were used to conduct multiple cash advances using their recently opened TD Bank accounts.[9] Records show that each trip to a casino where a cash advance was obtained involved very little actual play of games or slots at the casinos themselves. Casino records indicate that SINGH and AFRIDI provided their NJ-issued drivers' licenses to complete these transactions, per casino policy.

---

[9] A casino cash advance is a cash withdrawal from a cashier at a casino whose responsibility it is to provide cash, tokens, chips, exchanges, and carry out other transactions for customers.  These advances usually take place at the casino "cages".

Additionally, surveillance footage obtained showed SINGH and AFRIDI completing these transactions themselves using the debit cards for the aforementioned TD Bank accounts.

57. On April 19, 2019 at around 0000 hours, AFRIDI's accounts ending in 1943, 2420, and 2438 were used to obtain $4,915 in cash advances at the Horseshoe Casino cages in Baltimore, MD. AFRIDI's accounts ending in 62107, 2397, and 2404 were also used to make $4,815 in cash advances at the cage. Each one of these accounts belonging to AFRIDI was used to make a $705.99 withdrawal at ATMs at the casino. This activity totaled $31,535.94. Casino records confirm this activity, but video footage was not obtained.

58. On April 20, 2019, AFRIDI made three cash advances for $4,600 each ($13,800 total) at Maryland Live! Casino using accounts ending in 62107, 2397, and 2404. AFRIDI also used each account to make a $705.99 withdrawal at ATMs at the casino. Video footage shows AFRIDI present at the casino for these transactions at from 0124-0134 hours at Window #5 with a cashier. In the picture below, AFRIDI is wearing a black t-shirt and is in the center of a still from video footage of the Maryland Live! Casino ballroom lobby.



59. On April 19, 2019, SINGH's accounts ending in 2090, 2115, 52107, and 2123 were used to make $4,915 in cash advances at Horseshoe Casino. Accounts ending in 52107 and 2123 were also used for an ATM withdrawal for $705.99 there. Casino records also confirm this activity, but video footage was not obtained.

60. On April 22, 2019, at cage #STC8143 at Delaware Park Casino in Wilmington, DE, AFRIDI made two cash advances using accounts 2420 and 2397 for $4,600 each at DE Park Casino. SINGH also made cash advances at cage #STC8143 using account 2123 and 4362952107 for $4,280 and $4729.99, respectively. Video footage shows both men arriving in the same vehicle and subsequently carrying out these transactions. DE Park Casino records show that AFRIDI then played $500 at a Blackjack table, while SINGH then played $400 at a Roulette

table. Video footage (below) shows SINGH entering the casino with AFRIDI and two other

unidentified males, then each playing table games as described above and making

withdrawals at the cash cages. In the still from the Delaware Park Casino entrance below,

SINGH can be seen in a gray jacket near the main doors, while AFRIDI is on the right of

SINGH wearing a black t-shirt.



Descriptions of pictures below in the order in which they appear:

1. SINGH can be seen in a gray jacket and glasses in the very top of the still at a roulette table.

2. SINGH can be seen in the left of the picture at the cage window presenting a green TD Bank card.

3.  AFRIDI can be seen in the left of the picture at the cage window with a green TD Bank card in hand.







61. In total from April 19, 2019 to April 23, 2019, between cash advances at casinos, ATM withdrawals, checks written, and transfers between accounts, AFRIDI's six accounts were used to attempt $282,756.92 in transactions, with $152,177.92 in actual withdrawals/transfers completed. From April 15, 2019 to April 24, 2019, SINGH's four accounts were used to attempt $200,572.82 in transactions, with $86,619.60 in actual withdrawals/transfers completed.

**E. Accounts Charged Off**

62. After the transfer and withdrawal activity in April 2019, none of the foregoing accounts were used at all in May 2019. The accounts were all charged off (closed with a negative balance suffered by the bank and not the account holder) in June 2019 as follows:

| Date | Name | Amount Charged Off |
|---|---|---|
| 6/19/2019 | Account # 2090 (Dogar Logistics) | $12,095.51 |
| 6/19/2019 | Account # 2115 (Dogar Logistics) | $39,694.99 |

| | | |
|---|---|---:|
| 6/24/2019 | Account # 52107 (Dogar Logistics) | $28,403.97 |
| 4/29/2019 | Account # 2123 (Dogar Singh) | $0.00 |
| 6/24/2019 | Account # 1943 (RF Fashion Collection Corp) | $21,223.37 |
| 6/19/2019 | Account # 62107 (RSA Trucking NJ LLC) | 56,973.96 |
| 6/24/2019 | Account # 2397 (RSA Trucking NJ LLC) | $17,403.96 |
| 6/24/2019 | Account # 2404 (RSA Trucking NJ LLC) | $12,241.68 |
| 6/24/2019 | Account # 2420 (RF Fashion Collection Corp) | $21,785.98 |
| 6/24/2019 | Account # 2438 (RF Fashion Collection Corp) | $22,328.97 |
| | | **TOTAL: $232,152.40** |

63. The total charged off from all of the accounts was $232,152.40, which was the actual loss suffered by TD Bank as a result of this scheme. This amount includes all of the outgoing checks (not all of which were cashed), transfers between accounts, ATM withdrawals, and casino cash advances that were successfully completed. The intended loss/exposure for TD Bank as a result of this scam totals $776,900.00 and is the sum of all the fraudulent refunds made to these accounts by Al Madina Kabob. The difference between the two amounts is due to the fact that the outgoing flow of funds from these accounts amounted to less than the flow of fraudulent funds into the accounts.

64. The refund credits from Al Madina Kabob into each of the foregoing accounts were fraudulent and ultimately led to financial loss suffered by TD Bank. The rapid movement of funds by the suspects into and out of the accounts before the refund payments were reversed as fraudulent demonstrates AFRIDI and SINGH's knowledge of the fraud. The subsequent transfers of funds between their accounts, issuance of checks to the same businesses, and appearance at the same casinos at the same time to conduct nearly identical transactions demonstrates that both conspired to and carried out acts in furtherance of this scheme.

65. The aforementioned invalid authorizations (i.e. refunds and chargebacks) from Al Madina Kabob to accounts held by SINGH and AFRIDI matches the pattern of fraudulent activity carried out by the other 75 suspect merchants that led to loss on the part of a network of banks. Further, it took place around the same time that both BBQ Tonite and Al Madina Kabob were carrying out invalid authorization fraud that led to loss on the part of Fiserv.

## VIII.   THE TARGET BUSINESS

66. Based on the information set forth elsewhere in this affidavit, my training, experience, and participation in bank fraud and wire fraud investigations, and my conversations with other law enforcement officers, there is probable cause to believe that the TARGET BUSINESS identified in attachment A is a location that contains fruits, evidence, and instrumentalities of bank fraud, in violation of 18 U.S.C. § 1344; Wire Fraud, in violation of 18 U.S.C. § 1343; Conspiracy to Commit Bank and Wire Fraud, in violation of 18 U.S.C. § 1349; and Access Device Fraud, in violation of 18 U.S.C. § 1029.  Based on my training and experience, financial fraudsters utilize their residences as well as their vehicles for the storage and transport of the forgoing documents and items.

67. Based upon my participation in this and other investigations, as well as my conversations with other agents, I know that perpetrators of financial institution fraud often maintain financial records and financial instruments related to their fraudulent activity and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, precious metals, real estate records, and transaction receipts. Such documents are frequently maintained where the fraudsters have ready access to them, including in their residences and vehicles.

68. Perpetrators of financial institution fraud commonly maintain books, records and other documents that identify and contain the names, addresses and/or telephone numbers of associates in their fraudulent activities, including, but not limited to: address books, telephones, cellphones, iPads, Tablets, or personal digital assistants with stored telephone information, notes reflecting telephone numbers, photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film). These items are maintained in their residences and vehicles, where they may be easily accessed and kept securely.

69. Perpetrators of financial institution fraud commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts; indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises or vehicles.

70. Perpetrators of financial institution fraud commonly maintain the foregoing items inside combination or key-lock safes or strong boxes, suitcases, locked cabinets and other types of locked or closed containers, or hidden compartments, which are secreted in locations where they may maintain these items securely. These boxes and containers may be found and are frequently stored at businesses associated with the fraud scheme.

## IX.   COMPUTERS, CELL PHONES, AND COMPUTER EQUIPMENT

71. These applications seek permission to search for records that might be found in the TARGET BUSINESS in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).  I submit that if a computer or storage medium is found in the TARGET BUSINESS, there is probable cause to believe

those records will be stored on that computer or storage medium, for at least the following

reasons:

72. Based on my knowledge, training, and experience, I know that computer files or remnants of

such files can be recovered months or even years after they have been downloaded onto a

storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage

medium can be stored for years at little or no cost.  Even when files have been deleted, they

can be recovered months or years later using forensic tools.  This is so because when a

person "deletes" a file on a computer, the data contained in the file does not actually

disappear; rather, that data remains on the storage medium until it is overwritten by new data.

73. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

space—that is, in space on the storage medium that is not currently being used by an active

file—for long periods of time before they are overwritten.  In addition, a computer's

operating system may also keep a record of deleted data in a "swap" or "recovery" file.

74. Wholly apart from user-generated files, computer storage media—in particular, computers'

internal hard drives—contain electronic evidence of how a computer has been used, what it

has been used for, and who has used it.  To give a few examples, this forensic evidence can

take the form of operating system configurations, artifacts from operating system or

application operation, file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this information.

75. Similarly, files that have been viewed via the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache."

76. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

   a.  The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.

   b.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

77. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools. As explained, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly

examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

78. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for the TARGET BUSINESS set forth in Attachment A would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant as set forth in Attachment B.

## **CONCLUSION**

79. The foregoing demonstrates that Dogar SINGH and Rehan AFRIDI opened TD Bank accounts with the intention of making withdrawals, cash advances, check payments, and transfers to their own accounts and each other's accounts that were fraudulent using account balances inflated by unauthorized refunds from BBQ Tonite/Al Madina Kabob of Gwynn Oak, MD.

80. Based on the foregoing, I submit that there is probable cause to believe that Dogar SINGH and Rehan AFRIDI have committed violations of 18 U.S.C. § 1349 (Conspiracy to Commit Bank Fraud).

81. Further, based on the foregoing, I submit that there is probable cause to search the TARGET BUSINESS for evidence of the TARGET OFFENSES.

82. WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue arrest warrants for Dogar SINGH and Rehan AFRIDI, and a search warrant for the TARGET BUSINESS.

1:20-mj-1699 to -1701 TMD

Emily Zagone
Special Agent
United States Secret Service

Subscribed and sworn to before me this ⟨2⟩ day of July, 2020.

The Honorable Thomas M. DiGirolamo
United States Magistrate Judge